IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MICHELLE BYERS, | ) | CASE NO. 1:14CV154 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Michelle Byers ("Byers") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the parties.  Doc. 14.

For the reasons stated below, the Commissioner's decision is **AFFIRMED**.

## I. Procedural History

Byers protectively filed an application for DIB and SSI on March 2, 2010, alleging a disability onset date of December 12, 2008.  Tr. 19, 171, 178.  She alleged disability based on the following: "depression, PTSD, anxiety, obsessive compulsive pull out hair."  Tr. 230.  After denials by the state agency initially (Tr. 92, 95) and on reconsideration (Tr. 108, 115), Byers requested an administrative hearing.  Tr. 122.  A hearing was held before Administrative Law Judge ("ALJ") Valencia Jarvis on April 11, 2012.  Tr. 35-66.  At the hearing, Byers moved to amend her alleged onset date to January 26, 2010.  Tr. 39, 19.  In her April 27, 2012, decision

1

(Tr. 19-28), the ALJ determined that there were jobs that existed in significant numbers in the national economy that Byers could perform, i.e., she was not disabled. Tr. 27.  Byers requested review of the ALJ's decision by the Appeals Council (Tr. 15) and, on November 25, 2013, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-4.[1]

## II. Evidence

### A.  Personal and Vocational Evidence

Byers was born in 1970 and was 39 years old on the date her application was filed.  Tr. 215.  She has at least a high school education and is able to communicate in English.  Tr. 236, 229, 27.  She last worked in 2008.  Tr. 230.

### B.  Relevant Medical Evidence[2]

### 1.  Mental

On January 26, 2010, Byers was released from a transitional control program at Oriana House following her incarceration.  Tr. 406.  A release report indicates that she had a history of depression, anxiety, and posttraumatic stress disorder ("PTSD").  Tr. 406.

On April 9, 2010, Byers saw Lokesh Puttalingappa, M.D., complaining of migraine headaches.  Tr. 591.  Byers asserted that she had been uninsured for some time and wanted to refill her medication and establish a treatment relationship.  Tr. 591.  She reported that she had been diagnosed as bipolar but denied any symptoms at the time of the visit. Tr. 591.  Dr. Puttalingappa observed that Byers' general appearance was healthy, alert and pleasant.  Tr. 591.

---

[1]  The Appeals Counsel initially denied Byers' request for review on August 24, 2013 (Tr. 9-11) and again on November 23, 2013, after considering additional evidence (Tr. 1-4).

[2]  Byers' brief describes evidence dated after her period of incarceration ended, on January 26, 2010, consistent with her amended onset date.  Doc. 16, p. 4.

Dr. Puttalingappa commented that Byers' depression and anxiety were controlled with medication and ordered refills.  Tr. 592.

   On August 11, 2010, Byers was evaluated by Leanne Cavanagh, M.Ed.  Tr. 497-504.  Byers reported a history of panic attacks and physical and sexual abuse.  Tr. 498.  She described severe intrusive thoughts, nightmares, and flashbacks of finding her father's body after he was murdered.  Tr. 499.  She complained of auditory and visual hallucinations, grandiose thinking, and stated that she pulls out her hair.  Tr. 500.   Cavanagh diagnosed her with PTSD, mood disorder, panic disorder with agoraphobia, trichotillomania,[3] and a possible psychotic disorder.  Tr. 501.  Cavanagh assessed a Global Assessment of Functioning (GAF) Score of 44.[4]  Tr. 501.

   On December 6, 2010, Byers saw Susan L. Ensch, a licensed social worker.  Tr. 542.  Byers stated that she was told to keep up with her mental health treatment and that she wants to keep up with her mental wellness.  Tr. 542.  She reported the same symptoms and history as her previous appointment.  Tr. 543-544.  She also reported sleep disturbance, irritability, difficulty concentrating, thoughts of death, an exaggerated startle response, and detachment from others.  Tr. 543-544.   Upon mental status examination, Byers was well-groomed, cooperative, and oriented to time, person and place.  Tr. 546.  Her speech was clear and slow, judgment and insight were fair, and her thought process was logical and organized, with tight associations.  Tr. 546.  She was depressed and her mood was blunted.  Tr. 546.  Ensch diagnosed her with mood

---

[3]  Trichotillomania is a disorder characterized by compulsively pulling out one's hair.  *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 1965.

[4]  GAF (Global Assessment of Functioning ) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. See American Psychiatric Association: Diagnostic & Statistical Manual of Mental Health Disorders, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)."  *Id.*

and panic disorder, PTSD, with rule-out diagnoses of schizoid disorders and mood disorder with psychosis.  Tr. 546.

On January 10, 2011, Byers was prescribed Klonopin for anxiety.  Tr. 520.  She reported that she lives with her mother and spends time watching television.  Tr. 520.

On February 10, 2011, Byers saw Sarah Senita, a certified nurse practitioner (CNP).  Tr. 602-604.  Byers complained that she still felt depressed.  Tr. 602.  She stated that a fire and a gas leak occurred in her mother's house that caused too much traffic in the house and that, as a result, she had increased paranoia. Tr. 602-603.  She experienced "a few" panic attacks in the past few weeks and thought daily about dying in an accident.  Tr. 603.  She reported that she hears voices and noise and that she gets flashbacks of her father.  Tr. 603.  She does not like to take showers when she is home alone.  Tr. 603.  She had not taken her prescribed Zoloft for two weeks because "she didn't have the money."  Tr. 603.

Upon mental examination, Byers was adequately groomed, cooperative, withdrawn, and guarded.  Tr. 603.  She was oriented to time, person and place, and her speech was spontaneous and normal.  Tr. 603.  Her thought process was logical and organized, although she had paranoid thoughts.  Tr. 603.  Her mood was anxious and dysphoric.  Tr. 603.  Her attention was sustained and her recent and remote memories were within normal limits.  Tr. 603.  Her judgment and insight were poor.  Tr. 603.  Senita diagnosed Byers with mood and anxiety disorders, PTSD, and psychosis.  Tr. 604.  She commented that Byers' paranoia and guarded manner "really limits her functioning outside the house, and even what she is able to do at home."  TR 604.  She opined that antipsychotic medication "will be vital to improving her functioning."  Tr. 604.  She observed that, although Byers complained of worsening depression, Byers had not been taking

her Zoloft.  Tr. 604.  Senita wrote, "will continue to encourage compliance to help her feel better."  Tr. 604.  Byers had money that day to refill her prescriptions.  Tr. 603.

On March 11, 2011, Byers saw Senita again.  Tr. 598.  Byers reported no change.  Tr. 598.  Senita commented, "unsure how much Zoloft [Byers] really is taking."  Tr. 599.  She continued to encourage medication compliance to relieve Byers' symptoms.  Tr. 599.

On May 13, 2011, Byers reported to Senita that she "had signed up for a class at Tri C, felt motivated to do it, then had problems focusing, taking the test, [and] ended up failing the class."  Tr. 767.  She felt bad about the class and did not leave the house for "a couple weeks."  Tr. 767.  She had anxiety when she was taking the class, but it had improved afterwards.  Tr. 767.  Senita observed that Byers' "psychosis seems to have improved with higher dose of zyprexa."  Tr. 768.

On July 5, 2011, Byers complained that she was still depressed and that anxiety was keeping her up at night.  Tr. 927.  She reported that she did not like to be home alone, especially at night.  Tr. 927.  She relayed that she had been walking more.  Tr. 927.  Senita discussed changing Byers' antidepressants and noted that Byers "wants to think about it."  Tr. 927.

On August 19, 2011, Byers stated that she felt more relaxed at night with an increased dose of Klonopin but that her sleep had not improved.  Tr. 921.  She still did not like being home alone.  Tr. 921.  She reported that she had some "ok days" but that her depression was the same.  Tr. 921.  She worked in the yard and tried to go on walks, although she lacked energy and had to force herself to walk.  Tr. 921-922.  Senita wrote, "[d]epressive symptoms remain, would like to switch antidepressant, but [Byers] not willing at this time."  Tr. 922.

On September 30, 2011, Byers reported that she had just got back from a trip to Florida but did not enjoy herself.  Tr. 915.  Her anxiety was slightly improved.  Tr. 915.  On December

12, 2011, Byers told Senita that she had been sick for a few weeks and did not take any of her medications for a week. Tr. 971. Senita encouraged Byers to take her medication, even when she was sick. Tr. 971. Byers reported that she was planning on going to see the "Christmas Story house this weekend" and was looking forward to that. Tr. 971. Senita wrote, "[d]epressive symptoms remain, would like to switch antidepressant, but [Byers] not willing." Tr. 972.

On March 23, 2012, Byers saw Morgan Wiggins, CNP.[5] Tr. 979-983. Byers reported that she was hearing fewer voices. Tr. 979. She denied "special powers," "thought insertions/deletions," and "ideas of reference." Tr. 979. When asked about paranoia, Byers answered, "[s]ometimes, yeah. I don't really like to go out too much lately." Tr. 979. She complained of depressive symptoms that were "recently getting worse for about a year." Tr. 979. She reported insomnia, fatigue, decreased concentration, anxiety, irritability, restlessness, panic attacks, and that she still pulls her hair out. Tr. 979-980. She thought about death every day. Tr. 979. Wiggins observed that Byers had psychomotor retardation. Tr. 979.

Upon mental status examination, Wiggins commented that Byers had a guarded demeanor with intermittent eye contact. Tr. 981. She denied audio and visual hallucinations and Wiggins did not find evidence of delusional thought content. Tr. 981. Wiggins described Byers' memory and cognition as grossly intact, her insight as poor to fair, and her judgment as fair. Tr. 981. Wiggins diagnosed Byers with mood disorder and anxiety disorder and assessed a GAF of 41-50. Tr. 982.

### 2. Physical[6]

---

[5] This visit occurred after the hearing and before the ALJ's decision.

[6] In her brief on the merits, Byers includes medical records reflecting back pain. Doc. 16, pp. 4-5. Byers does not, however, address the ALJ's decision with respect to her back pain, only with respect to her elbow pain. Moreover, at the hearing, Byers' attorney only discussed Byers' right elbow. *See* Tr. 48. Accordingly, the Court primarily sets forth Byers' physical medical records pertaining to her elbow pain.

On August 27, 2010, Byers saw Kellie Atlas, CNP, complaining of right arm pain.  Tr. 563.  Byers used over-the-counter remedies and ice and heat packs but these did not provide pain relief.  Tr. 563.  She denied increased swelling, redness, or warmth, and denied a limited range of motion or paraesthesia.  Tr. 563.  She reported having trouble holding or carrying objects.  Tr. 563.  She stated that she felt that her elbow problem was the result of an auto-immune disorder.  Tr. 563.  Upon physical examination, Byers showed full range of motion and muscle strength in her right arm.  Tr. 565.  She showed no signs of pain and Atlas described her left arm exam as unremarkable.  Tr. 565.  Atlas diagnosed Byers with unspecified myalgias and myositis.  Tr. 566.

On August 27, 2010, x-rays of Byers' right elbow showed a small osteophyte suggesting mild degenerative changes.  Tr. 705.  An x-ray of her right forearm was normal and an x-ray of her right humerus showed mild narrowing of the subacromiel space suggesting chronic rotator cuff disease.  Tr. 705.

On September 12, 2010, Byers presented to the emergency department at Parma Community Hospital complaining of pain in her right shoulder.  Tr. 469.  Byers reported that she had pain in her shoulder for several months and that it felt like it was getting better, but that she aggravated it that day when she pulled the cord on a lawnmower in an attempt to start it.  Tr. 469.  She denied pain in other areas.  Tr. 469.  Steven Markowitz, M.D., prescribed a short burst of steroids and Vicodin and referred Byers to an orthopedist if her pain did not improve.  Tr. 470.  Dr. Markowitz noted that Byers indicated that she may not be able to follow up because of problems with her insurance.  Tr. 470.

On September 22, 2010, Byers saw Atlas again, complaining of pain in her right shoulder and elbow and seeking the results of the x-rays taken the month before.  Tr. 556.  Byers reported paraesthesia extending down her arm and into her fingers and a limited range of motion.  Tr. 556.

She also stated that Vicodin "does not really help so much."  Tr. 556   Upon examination, Byers'
right shoulder area was painful when palpitated and she had reduced muscle strength.  Tr. 558.
Atlas prescribed medication and referred Byers to physical therapy.  Tr. 558.

On October 18, 2010, Byers saw Dr. James Murphy, an orthopedist.  Tr. 554.  Byers
described a "vague pain" over the lateral aspect of her elbow.  Tr. 554.  She reported that she had
tennis elbow in the past but that this felt different.  Tr. 554.  Upon examination, Dr. Murphy
found that Byers' point of maximal tenderness was slightly distal to her lateral epicondyle.  Tr.
554.  He advised that Byers should have an EMG to rule out radially tunnel syndrome versus
vague ulnar nerve compression.  Tr. 555.   Byers' EMG result was within normal limits.  Tr. 549.

On November 15, 2010, Byers "insisted" upon an injection for pain relief.  Tr.  550.  The
provider discussed conservative pain management and diagnosed Byers with epidondylitis, or
tennis elbow.  Tr. 550.

On December 10, 2010, Byers was referred to occupational therapist Kathy Stroh for
occupational therapy, evaluation and treatment.  Tr. 538.  At that time, Byers had pain, a
decreased range of motion and strength, and impaired self-care and home management abilities.
Tr. 540.  On December 20, 2010, Byers saw Dr. Purnima Bansal and complained of constant
pain, 7/10, and that the pain radiated up into her shoulder.  Tr. 528.  She also reported
paresthesia.  Tr. 528.  Dr. Bansal discussed exercises with Byers, advised that she continue
therapy, and instructed her to wear her elbow brace more often, preferably all day.  Tr. 531.

On December 20, 2010, Byers saw Stroh and reported that her pain was worse.  Tr. 526.
On January 3, 2011, Byers complained of continuing pain despite conservative treatment
including therapy, NSAIDs, a steroid injection, and an elbow brace and wrist splint.  Tr. 524.

She was advised to continue conservative treatment.  Tr. 524.  On January 26, 2011, Byers described her pain to Stroh as 9/10.  Tr. 505.

On January 11, 2011, Byers presented to the emergency department complaining of right elbow pain.  Tr. 516-517.  She was sent home with Ultram for her pain.  Tr. 518.  On January 25, 2011, an MRI of Byers' right elbow showed findings consistent with lateral epicondylitis and was otherwise unremarkable. Tr. 698.

On February 13, 2011, Byers presented to the emergency department complaining of right elbow pain and having run out of pain medication.  Tr. 633.  She was given "IM analgesics" and discharged.  Tr. 634.

On February 18, 2011, Byers saw Atlas and reported continued right elbow pain.  Tr. 627.  Atlas gave Byers a Toradol injection and discussed a Neurontin trial.  Tr. 630.  Byers reported that she believed she would require surgery.  Tr. 627.

On March 24, 2011, Byers saw Dr. Brendan Astley.  Tr. 620-622.  Dr. Astley gave Byers a right lateral epicondyle block and prescribed medication for pain, including Lyrica.  Tr. 622. On April 12, 2011, Byers complained of increased elbow pain made worse by flexion.  Tr. 787. She noted that she had not started her Lyrica because she took it to a different pharmacy where the price was cost prohibitive.  Tr. 787.  Byers was advised to begin taking Lyrica as soon as possible.  Tr. 787.

On April 18, 2011, Byers saw Zachary Gordon, M.D., and Kevin Malone, M.D.  Tr. 784-785.  Drs. Gordon and Malone recommended surgical debridement of the lateral epicondyle and diagnostic elbow arthroscopy.  Tr. 785.  On May 11, 2011, Byers received a pain block from Thomas Scott, M.D., under the supervision of Dr. Astley.  Tr. 776-777.  The same day, Byers' surgery was performed by Dr. Malone.  Tr. 774-775.

On May 23, 2011, Byers reported to Stroh that her right elbow pain was 6-7/10.  Tr. 763-764.  On June 20, 2011, Byers saw Krista Mousted, CNP.  Tr. 907.  Byers stated that her pain was unchanged.  Tr. 907.  On July 26, 2011, Byers saw Stroh and complained of right arm pain.  Tr. 886-888.  Byers reported that she required increased time to perform daily activities and was having difficulty cooking, cleaning, combing hair, lifting groceries and a cup of coffee.  Tr. 888.  On August 3, 2011, she described her pain as 6/10.  Tr. 881.  She reported that she "did a lot early on after surgery."  Tr. 882.  Stroh commented that they would work on strengthening and stretching.  Tr. 882.

On August 5, 2011, Byers listed her pain as 5/10.  Tr. 874-875.  On August 16, 2011, Byers' pain was 3/10.  Tr. 868-869.  She noted that she participated in a spinning class.  Tr. 868.  On August 23, 2011, she described her pain as 6/10.  Tr. 863.  She stated, "the spinning classes are hard on my arm, you have to lean on it."  Tr. 862.  Stroh advised Byers to not do things that hurt, such as leaning on her arm during spinning class.  Tr. 863.  On September 13, 2011, Byers rated her pain as 6/10.  Tr. 856.  She stated that she had just come from her Zumba class and that resting made her arm feel better.  Tr. 857.

On October 6, 2011, Byers saw Michael Bassett, M.D.  Tr. 894.  She reported that her pain was 7/10 and that medications helped manage her pain.  Tr. 894.  She had stopped going to occupational therapy and wanted to see orthopedic doctors again. Tr. 894.  Dr. Basset advised her to continue with occupational therapy and reinforced the importance of a regular program to improve strength and flexibility.  Tr. 894-895.  He prescribed Gabapentin and referred Byers "to orthopedics."  Tr. 895.

On December 12, 2011, Byers saw Emily Gorman, M.D.  Tr. 955.  Byers requested an injection for pain.  Tr. 955.  She reported that she was out of her pain medications. Tr. 955.  She

had a full range of motion in her arm and no weakness.  Tr. 956.  Dr. Gorman gave Byers an injection and counseled her that pain management and therapy would be most helpful for her continued pain.  Tr. 956.

On January 6, 2012, Byers saw Mousted for pain management.  Tr. 946.  Byers reported that she had not taken her Neurontin consistently and that she did not understand how that medication is supposed to work.  Tr. 946.

### C.  Medical Opinion Evidence

#### 1.  Treating Source

On July 19, 2011, Sarah Senita, CNP, and Toni Love Johnson, M.D., completed an assessment regarding Byers' mental ability to do work-related activities.  Tr. 807-808.  They opined that Byers had marked limitations in maintaining attention and concentration for extended periods and responding to customary work pressures.  Tr. 807-808.  They assigned moderate limitations in Byers' ability to relate to others, including coworkers and supervisors; complete daily activities and socialize; sustain a routine without special supervision; perform on schedule, maintain attendance, and be punctual; understand, carry out, and remember instructions; perform complex, repetitive or varied tasks; respond appropriately to changes in the work setting; and behave in an emotionally stable manner.  Tr. 807-808.  They commented that Byers' impairments or treatment would cause her to miss work more than three days a week.  Tr. 808.  In response to the question, "has the patient's severity of limitations existed since at least 12/12/08?" Senita and Dr. Johnson answered, "probably.  Patient has only been seen in this department since 12/06/2010."  Tr. 808.

On November 28, 2011, Senita and Dr. Johnson provided a revised opinion.  Tr. 941-942.

They opined that Byers had extreme limitations in her ability to maintain attention and concentration for extended periods and to perform complex, repetitive or varied tasks.  Tr. 941-942.  They assigned marked limitations in Byers' ability to relate to others, including coworkers and supervisors; perform activities of daily living and socialize; sustain a routine without special supervision; perform on a schedule, maintain attendance, and be punctual; respond to customary work pressures; respond appropriately to changes in the work setting; and behave in an emotionally stable manner.  Tr. 941-942.  They assigned moderate limitations in Byers' ability to understand, carry out, and remember instructions and to perform simple tasks.  Tr. 941-942.  They commented that Byers' impairments or treatment would cause her to miss work more than three days a week.  Tr. 942.  In response to the question, "has the patient's severity of limitations existed since at least 12/12/08?" Senita and Dr. Johnson answered "yes" without further explanation.  Tr. 942.

### 2.  Consultative Examiner

On October 6, 2010, Deborah A. Koricke, Ph.D, a clinical psychologist, conducted a consultative examination.  Tr. 476-481.  Byers reported her typical mood as scared, depressed, anxious, and stressed.  Tr. 477.   She stated that she has problems concentrating and feels hopeless and helpless.  Tr. 478.  She has no energy, interests or motivation and is irritable, angry and socially withdrawn.  Tr. 478.  She has crying spells and panic attacks.  Tr. 478.  She fears leaving the house.  Tr. 478.  She lost interest in cooking, working, and spending time with her family.  Tr. 479.

Dr. Koricke described Byers as neat, clean and cooperative.  Tr. 478.  She observed that Byers put forth limited effort to interact and that she was depressed, withdrawn, and anxious.  Tr. 478.  She commented that Byers exhibited good attention throughout the examination and Dr.

Koricke observed no evidence of attention deficits.  Tr. 478.  Byers put forth adequate effort on mental status tasks and persisted with encouragement.  Tr. 478.   Her flow of conversation and thought was normal and her insight and judgment were good.  Tr. 478-479.  She denied auditory and visual hallucinations and Dr. Koricke noted that Byers did not appear to suffer any during the examination.  Tr. 478-479.  Byers' memory for history was good and she completed serial sevens.  Tr. 479.  Dr. Koricke commented that Byers' mood was somewhat anxious and that she appeared to be depressed and unhappy.  Tr. 478.  She lacked animation, spoke in monotone and made little eye contact.  Tr. 478.   Byers reported a poor appetite and sleep pattern but denied episodes of mania.  Tr. 478.  She had a blunted affect and a retarded energy level.  Tr. 478.

Dr. Koricke diagnosed Byers with panic disorder with agoraphobia, PTSD, trichotillomania, polysubstance dependence and personality disorder with borderline traits.  Tr. 479.  She assigned a GAF score of 60.[7]  Tr. 479.  She opined that Byers' ability to relate to others, including coworkers and supervisors, and her ability to withstand the stress and pressures associated with day-to-day work is moderately impaired.  Tr. 480.  She found Byers not impaired in her ability to understand, remember, and follow instructions and her ability to maintain attention, concentration, persistence, and pace to perform simple repetitive tasks.  Tr. 480.

### 3.  State Agency Reviewers

On November 5, 2010, Michael E. Cremerius, Ph.D., a state agency reviewer, reviewed Byers' record and completed a psychiatric review technique.  Tr. 482-495.  Dr. Cremerius diagnosed Byers with anxiety disorder, personality disorder and substance addiction disorder.  Tr. 482.  He opined that Byers had mild limitations in activities of daily living and maintaining concentration, persistence, or pace and moderate difficulties in maintaining social functioning.

---

[7]  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *See* DSM-IV-TR, at 34.

Tr. 490.  He commented that Byers' allegations of mental impairments are partially credible,
explaining that Byers' prison records and Dr. Koricke's report did not fully support the severity
and functional limitations alleged.  Tr. 492.  Regarding Byers' mental residual functional
capacity ("RFC"), Dr. Cremerius opined that Byers had the capacity to understand, remember,
and carry out a variety of simple and detailed three-to-four-step tasks in a setting that required
only brief, superficial contact with the public, coworkers, and supervisors.  Tr. 495.

On May 13, 2011, W. Jerry McCloud, M.D., a state agency reviewer, reviewed Byers'
record and assessed Byers' physical RFC.  Tr. 712-719.  Dr. McCloud opined that Byers had the
ability to occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five
pounds, stand and/or walk for about six hours in an eight-hour workday, sit for about six hours in
an eight-hour workday, and was unlimited in her ability to push and/or pull.  Tr. 713.

### D.  Testimonial Evidence

#### 1.  Byers' Testimony

Byers was represented by counsel and testified at the administrative hearing.  Tr. 40-60,
62.  She testified that she obtained a GED.  Tr. 40, 62.  She has lived with her mother for fifteen
years; however, part of that time was spent in jail and then in a halfway house.  Tr. 40-41.  She
was incarcerated because of theft from her employer and was released in January 2010.  Tr. 41,
58.

She last worked as an account clerk in 2008.  Tr. 58.  She previously worked in customer
service at Chase bank from 2000-2007, had a job overlooking juveniles at a treatment center
from 1996 until 2000, and worked as a babysitter from 1992-1996.  Tr. 58-59.  She also had a
job as a customer service representative in 2007-2008 but left that job because she was becoming
too angry with people who called and complained.  Tr. 59-60.

Byers stated that she suffered from depression and anxiety at least since January 2010. Tr. 42.  Because of her depression, she does not have social interactions and does not leave the house.  Tr. 42.  Friends come to the house "once in a while" and her mother takes her to doctor's appointments.  Tr. 42.  She no longer drives because she has a fear of dying.  Tr. 42-43.  She has flashbacks every week of finding her father murdered, being molested, and being incarcerated. Tr. 49.  She suffers panic attacks twice a week and it causes her to become paranoid.  Tr. 50. Her right arm is still sore despite surgery but she no longer drops things.  Tr. 48.

Byers testified that she spends the majority of her day at home watching television.  Tr. 41.  She does not do chores around the house because she does not like to leave her room.  Tr. 44.  She goes grocery shopping with her mother once a month, and she goes sometimes with a family friend to pick up medication or go to an appointment.  Tr. 45, 47.  Sometimes she takes a nap for a few hours during the day because her medications make her tired and she does not sleep well at night.  Tr. 46.  She has problems concentrating.  Tr. 45-46.  She does not cook or use the computer.  Tr. 45.

Byers testified that in April 2010 she would use the computer and that she would meet a person on the internet once in a while.  Tr. 51-52.  At that time she used to do a lot of gardening outside with her mother.  Tr. 53.  She also used to prepare her own meals.  Tr. 54.  She used to leave the house on her own but has not done so since about April 2011.  Tr. 52.  In September 2011 she flew to Florida on a trip with her mother and had to take medication so she could sleep. Tr. 55-56.  She took about four Zumba classes in 2011 but had to stop because she could not be around "all those people."  Tr. 56.  She has a membership to a gym and took one spinning class there.  Tr. 57.

### 2. Vocational Expert's Testimony

Vocational Expert Mark Anderson ("VE") testified at the hearing.  Tr. 60-65.  The ALJ discussed with the VE Byers' past relevant work as an account clerk, data-entry clerk, psychiatric aide at a treatment center, nanny, and customer service representative.  Tr. 61.  The ALJ asked the VE to determine whether a hypothetical individual of Byers' age, education, and work experience could perform the jobs she performed in the past if that person had the following characteristics: can occasionally lift up to fifty pounds, frequently lift and carry up to twenty-five pounds, stand and walk for six hours in an eight-hour day, sit for six hours in an eight-hour day, push and pull an unlimited amount, perform simple, detailed, three-to-four-step tasks, and can have superficial interaction with coworkers, the public and supervisors.  Tr. 62.  The VE testified that the person could not perform Byers' past relevant work.  Tr. 62.  The ALJ asked the VE if there are other jobs that the person could perform, and the VE testified that the person could perform jobs as a hand packager (1.5 million national jobs, 94,000 Ohio jobs, 19,000 northeast Ohio jobs), laundry laborer (180,000 national jobs, 30,000 Ohio jobs, 4,500 northeast Ohio jobs), and general laborer (239,000 national jobs, 13,000 Ohio jobs, 4,000 northeast Ohio jobs).  Tr. 63.

Next, the ALJ asked the VE to determine whether there was any work that the same hypothetical individual could perform if that individual would be limited to frequent pushing and pulling with her right upper extremity and frequent reaching overhead with her right upper extremity.  Tr. 63.  The VE replied that his answer would be the same as described above.  Tr. 63.

Byers' attorney asked the VE to consider a hypothetical individual with the characteristics previously described by the ALJ but who would be absent from work more than three times a month.  Tr. 64.  The VE answered that such an individual could perform work but

would be terminated because of her absences.  Tr. 64.  Byers' attorney next asked the VE to consider that the individual described would have marked limitations in responding to customary work pressures, i.e., would be off task 18% of the time.  Tr. 64.  The VE stated that an individual off task 18% of the time would not be competitive in terms of her production rate.  Tr. 64. Finally, Byers' attorney asked the VE to consider an individual who has a marked limitation, i.e., a serious limitation in the ability to function, with respect to responding appropriately to changes in the work setting and in responding appropriately to coworkers.  Tr. 65.  The VE replied that there would be no work for an individual who could not tolerate people in the same vicinity, who could not respond to commands and instructions from supervisors, and who would not act out in any way, physically or emotionally.  Tr. 65.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.      If the claimant is doing substantial gainful activity, he is not disabled.

2.      If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[8] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In her April 27, 2012, decision, the ALJ made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act through September 30, 2013.  Tr. 21.

2.      The claimant has not engaged in substantial gainful activity since December 12, 2008, the alleged onset date.  Tr. 21.

---

[8] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

3.      The claimant has the following severe impairments: epicondylitis of the right elbow, anxiety, depression, posttraumatic stress disorder, and personality disorder.  Tr. 21.

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 22.

5.      The claimant has the residual functional capacity to perform less than a full range of medium work as defined in 20 CFR 404.1567(c) and 416.967(c).  The claimant can lift and carry fifty pounds occasionally and twenty-five pounds frequently.  She can stand and walk for six hours in an eight-hour workday and sit for six hours in an eight-hour workday. The claimant can frequently push and pull with the right upper extremity and can perform frequent overhead reaching with the right upper extremity.  The claimant can perform simple, detailed tasks with three to four steps, and can have only superficial interaction with coworkers, the public and supervisors.  Tr. 23.

6.      The claimant is unable to perform any past relevant work.  Tr. 27.

7.      The claimant was born on July 4, 1970 and was 38 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 27.

8.      The claimant has at least a high school education and is able to communicate in English.  Tr. 27.

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.  Tr. 27.

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 27.

11.     The claimant has not been under a disability, as defined by the Social Security Act, from December 12, 2008, through the date of this decision. Tr. 28.

## V. Parties' Arguments

Byers objects to the ALJ's decision on four grounds.  She argues that the ALJ failed to comply with the treating physician rule; failed to assess all of Byers' impairments at Step Three of the sequential evaluation; failed to assess an RFC that accommodated Byers' moderate limitations in concentration, persistence and pace; and failed to properly assess Byers' credibility.  In response, the Commissioner contends that the ALJ properly considered the opinion evidence; did not err in her Step Three determination; assessed an RFC that accommodated Byers' moderate limitations in concentration, persistence or pace; and that substantial evidence supports the ALJ's credibility assessment.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 20*03).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1*992) (quoting *Brainard v. Sec'y of Health and Human Servs.,* 889 F.2d 679, 681 (6th Cir.19*89) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 19*84).

### A.  The ALJ did not err when she considered the opinions of Sarah Senita, CNP, and Dr. Johnson

Byers argues that the ALJ erred because she failed to provide good reasons for giving less weight, rather than controlling or deferential weight, to the treating source opinions of Sarah Senita, CNP, and Dr. Toni Johnson.  Doc. 16, pp. 14-16.  Under the treating physician rule, "[a]n

ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(d)(2).  A treating source is an acceptable medical source who provides, or has provided, a claimant with medical treatment or evaluation and who has had an ongoing treatment relationship with the claimant.  *See* 20 C.F.R. § 404.1502.  The Commissioner will generally consider there to be an "ongoing treatment relationship" when the medical evidence establishes that a claimant is or has been seen with a frequency consistent with accepted medical practice for the type of treatment or evaluation required for a claimant's medical condition.  *Id.*  "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once[.]"  *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 507 (6th Cir. 2006) (quoting *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994)). The plaintiff has the burden of showing that a doctor is a treating physician.  *See id.* at 506-508 (plaintiff failed to show doctor was a treating physician and, therefore, his opinion was not entitled to presumptive weight per the treating physician rule); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997) (claimant has the burden of proof in steps one through four). Before determining whether the ALJ complied with the treating source rule, the court first determines whether the source is a treating source.  *Cole v. Astrue*, 661 F.3d 931, 931, 938 (6th Cir. 2011) (citing *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007)).

Dr. Johnson is an acceptable medical source.  *See* 20 CFR § 404.1502.  However, it is not clear from the record that Byers ever saw Dr. Johnson.  Byers does not identify evidence in the

record showing that Dr. Johnson ever treated her.  As the ALJ noted, the opinion form was filled out by Senita and co-signed by Dr. Johnson.  Tr. 26, 808, 942.   Because Byers has not shown that Dr. Johnson is a treating source, her opinion is not subject to the treating physician rule. Senita, a nurse, is a non-accepted medical source and not subject to the treating physician rule. *See* Social Security Ruling 06-03p, 2006 WL 2329939, * 6.

Pursuant to 20 CFR § 404.1527(c), the Commissioner weighs medical opinion evidence that is not entitled to controlling weight based on the following: the examining relationship; the treatment relationship; the supportability of the opinion; the consistency of the opinion with the record as a whole; the specialization of the source; and other factors.  An ALJ should explain the weight she gives to a non-acceptable medical source opinion "or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or a subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case."  SSR 06-03p, 2006 WL 2329939, * 6.

Here, the ALJ explained why she gave the opinions of Senita and Dr. Johnson "little" weight.  First, the ALJ noted that the opinions offered no explanation for the limitations assessed. Tr. 26.  When deciding how much weight to give an opinion, an ALJ may take into account whether the opinion consists of checked boxes with no explanations.  *See Rogers v. Comm'r of Soc. Sec.*, 2000 WL 799332, at *6 (6th Cir. June 9, 2000) (ALJ did not err in failing to credit treating source opinions that failed to explain the reasons why certain boxes in the report forms were checked off); *Curler v. Comm'r of Soc. Sec.*, 561 Fed. App'x 464, 471-72 (6th Cir. 2014) (ALJ reasonably gave less than controlling weight to the opinions in the form filled out by plaintiff's treating psychiatrist when the form consisted solely of checked boxes with no explanations despite the form requiring explanations).  Specifically, the ALJ observed that there

22

was no explanation for the "significant decline noted between the two assessments and the opinions do not seem consistent with the claimant's activities of daily living."  Tr. 26.  As described, *supra*, the second opinion provided by Senita and Dr. Johnson came four months after the first opinion, described limitations far more severe than the first opinion, and contained no explanations as to what caused the decline.  The ALJ remarked that, although the first opinion mentioned that Byers began treatment in December 2010 and that it was only "probabl[e]" that her symptoms were present in 2008, the second opinion, without any explanation, stated that Byers' severe limitations were present in 2008.  Tr. 26, 808, 942.  Lastly, the ALJ stated that Byers was not compliant with taking her medications.[9]  Tr. 26.

With respect to Byers' activities of daily living, the ALJ pointed out that Byers took Zumba and spinning classes at a gym despite testifying that she "never leaves home by herself." Tr. 24.  The ALJ also noted that Byers hurt her arm attempting to start a lawn mower and that she reported "scrubbing" in the house, "indicating that she does some work outside and does help around the house."  Tr. 24.  The ALJ observed that Byers, despite stating that she spends all day on the couch smoking and watching television, reported that she was walking more and that drawing hurt her elbow.  Tr. 26.  The ALJ found that these inconsistencies reflected negatively on Byers' credibility.  Tr. 26.

Byers asserts that the ALJ "made the mistake of taking 'never,' which is rarely meant literally, literally."  Doc. 16, p. 21.  Byers' apparent argument is that the ALJ should not have taken Byers' testimony at face value because it was not accurate.  This argument is problematic for Byers—it is precisely because of inaccuracies and inconsistencies that the ALJ did not find Byers credible with respect to her activities of daily living.  Although Byers cites to evidence in support of her assertion that she has trouble leaving her home, Doc. 16, p. 21, substantial

---

[9]  The Court considers the ALJ's treatment of Byers' medication noncompliance in a separate section, *infra*.

evidence supports the ALJ's decision regarding Byers' credibility and the ALJ's reasons for the weight she assigned to the opinions of Senita and Dr. Johnson. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) (Because an ALJ is charged with observing a witness's demeanor, her findings on credibility must be accorded great weight and deference so long as substantial evidence supports her credibility determination); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (the Commissioner's decision is upheld so long as substantial evidence supports the ALJ's conclusion.).

Byers submits that the ALJ failed to discuss the treatment notes of Senita and Dr. Johnson. Doc. 16, p. 16. As noted, *supra*, Byers does not identify any treatment notes made by Dr. Johnson. Moreover, the ALJ is not required to cite every piece of evidence. *Peterson v. Comm'r of Soc. Sec.*, 552 Fed. App'x 533, 538 (6th Cir. 2014) (citing *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d241, 245 (6th Cir. 1989)). The ALJ observed that the opinions of Senita and Dr. Johnson were inconsistent with Byers' activities of daily living and that the opinions offered no explanation for the limitations assessed. Tr. 26. In sum, the ALJ's decision was sufficiently detailed so as to permit the Court to follow the ALJ's reasoning and it adequately explained why she gave little weight to the opinions of Senita and Dr. Johnson. *See* SSR 06-03p, 2006 WL 2329939, * 6; 20 CFR § 404.1527(c).

**B.  The ALJ did not err in her Step Three determination**

In her Step Three determination, the ALJ found that Byers has the following severe impairments: epicondylitis of the right elbow, anxiety, depression, PTSD, and personality disorder. Tr. 21. Byers argues that the ALJ erred because her decision did not mention Byers' "psychotic vs. schizoaffective disorder" or the relevant listing, 12.03, in her decision." Doc. 16, pp. 17, 18.

The ALJ considered whether Byers' impairments met or medically equaled the following listings: 12.04 (affective disorders), 12.06 (anxiety-related disorders), 12.08 (personality disorders), and 12.09 (substance addiction disorders).  Tr. 22.  To do so, the ALJ considered whether the paragraph B criteria were satisfied.  *See* 20 CFR Pt. 404, Supbt. P, App. 1 (when assessing mental disorders, the ALJ will consider whether the paragraph B criteria are met).  The ALJ found that Byers' impairments did not meet the paragraph B criteria because she had only mild difficulties in activities of daily living; moderate difficulties in social functioning and maintaining concentration, persistence or pace; and no episodes of decompensation which have been of extended duration.  Tr. 22-23.

Like the other mental health listings, Listing 12.03 (schizophrenic, paranoid and other psychotic disorders) requires a claimant meet the paragraph B criteria by showing marked limitations in at least two of the following areas: activities of daily living, social functioning, or maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration.  20 CFR Pt. 404, Supbt. P, App. 1.  Byers does not explain how the ALJ's failure to mention Listing 12.03 would have resulted in a different finding with respect to the paragraph B criteria.  She only states that she has marked restrictions in all areas of the paragraph B criteria and cites the opinions of Sarah Senita and Dr. Johnson in support.  Doc. 16, pp. 18-19.  As noted, the ALJ explained why he gave little weight to these opinions.  The ALJ properly considered the paragraph B criteria when assessing other related mental health listings and her failure to specifically mention Listing 12.03 is not error.[10]

---

[10]  Byers cites *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. App'x. 411, 416 (6th Cir. 2011), in support of her argument.  Doc. 16, p. 17.  In *Reynolds*, the ALJ determined that the claimant had a severe mental and physical impairment, "conducted a thorough analysis" of the mental impairment, but provided "[n]o analysis whatsoever" with respect to the claimant's physical impairments.  *Id.* at 415-416.  *Reynolds*, therefore, is not analogous to the ALJ's consideration of Byers' mental impairments because the ALJ thoroughly discussed Byers' mental health impairments at Step Three.

Byers also argues that the ALJ's failure to address Byers' elbow pain at Step Three "results in the impossibility of judicial review[.]"  Doc. 16, p. 19.  Byers states that she "readily meets listing 1.02B in substance; though she may not have a gross anatomical deformity of the ulnar joint" as required by Listing 1.02.  Doc. 16, p. 19; *see* 20 CFR Pt. 404, Subpt. P, App. 1, 1.02 ("Major dysfunction of a joint(s)....Characterized by gross anatomical deformity[.]").  In order to meet a listed impairment, a claimant must demonstrate that her impairment meets all the requirements for a listed impairment; an impairment that meets some of the requirements does not qualify.  *Griffiths v. Astrue*, 2011 , 2011 WL 53096, at *5 (N.D. Ohio Jan. 7, 2011) (citing *Hale v. Secretary*, 816 F.2d 1078, 1083 (6th Cir.1987); *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)).  Here, Byers concedes that she does not meet the requirements for Listing 1.02.  Accordingly, the ALJ's failure to provide a detailed analysis at Step Three with respect to Byers' physical impairment is harmless error.  *See Todd v. Astrue*, 2012 WL 2576435 at *10 (N.D. Ohio May 15, 2012) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result," quoting *Shkarbari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005)).

## C.  The ALJ's RFC assessment accounted for Byer's moderate limitations in concentration, persistence or pace

Byers asserts that the ALJ found that she had moderate limitations in concentration, persistence and pace but erred because her RFC assessment only restricted Byers to work involving simple, detailed tasks with three to four steps.  Doc. 16, p. 19.  Byers submits that, when an ALJ finds moderate limitations in concentration, persistence or pace, "she must include in her RFC assessment restrictions that speak to the speed- and pace-based elements of jobs that are affected by them" and cites *Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 516 (6th Cir. 2010), in support.  Doc. 16, p. 19.

26

In *Ealy*, the ALJ relied on an opinion of a state agency medical source who limited Ealy to "two-hour segments over an eight-hour day where speed was not critical."  594 F.3d at 516. The ALJ's hypothetical question to the VE, however, only included a limitation to simple, repetitive tasks and instructions in non-public work settings.  *Id.*  The Sixth Circuit held that the ALJ erred by failing to account for the speed- and pace-based limitations that he relied on in the medical source's opinion. *Id.*  Here, in contrast, the ALJ relied on Dr. Cremerius' opinion that contained no speed or pace-based limitations.  Tr. 26.  The ALJ's RFC assessment and her hypothetical question to the VE are consistent with Dr. Cremerius' opinion that Byers should be limited to performing simple, detailed tasks with three to four steps and only superficial interaction with coworkers, the public and supervisors.  Tr. 23, 62, 495.  This was not error.

### D.  The ALJ did not err in assessing Byers' credibility

Byers contends that the ALJ's credibility finding was "fraught with errors that cause it to constitute unjust prejudice against [Byers'] claim of disability."  Doc. 16, p. 21.  Byers asserts that the ALJ erred in finding that her testimony was inconsistent and that she was non-compliant in taking her medications.  Doc. 16, pp. 21-22.  The Court addressed Byers' argument with respect to consistency in her activities of daily living, *supra*.[11]  Byers' argument that the ALJ was not entitled to rely on Byers' noncompliance with treatment in her decision is without merit.

Byers argues that she was noncompliant with treatment because of financial problems and psychological confusion, both of which, Byers asserts, may not be used against her credibility.  Doc. 16, p. 23 (citing *McKnight v. Sullivan*, 927 F.2d 241, 242 (6th Cir. 1990); *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989)).  Byers has not identified evidence

---

[11]  Byers states, "the ALJ pounced upon Byers with these alleged inconsistencies [during the hearing], attempting to corner her in a lie."  Doc. 16, p. 22 (citing Tr. 51-58).  The fact that the ALJ questioned Byers about inconsistencies in her testimony and the record does not indicate an attempt to corner her in a lie so much as an attempt to understand and reconcile the inconsistencies.

that she suffered relevant financial problems or psychological confusion to the extent that she was unable to obtain treatment.  For example, although a treatment note from February 10, 2011, indicates that Byers had not taken her prescribed Zoloft for two weeks because she did not have the money, Byers stated on that day that she did have the money to refill her prescriptions.  Tr. 603.  Byers does not identify another mental health record before or after that date indicating that she could not afford her prescribed mental health medication.

Although Byers states that she was "confused" about her Zoloft prescription and dosage, Doc. 16, p. 22, the medical record does not clearly indicate who was "confused" about the amount of Zoloft Byers was taking—Byers or the individual writing the notes, Sarah Senita.  *See* Tr. 599 ("Unsure how much Zoloft she is really taking.").  Furthermore, there is nothing in the record indicating that Byers was "confused" about how much Zoloft to take or why she was not in compliance after having obtained the medication after initially stating that she did not fill her prescription because she did not have the money for it.  *See* Tr. 599 ("Continue to encourage medication compliance . . . . Encouraged her especially to start taking her Zoloft regularly so that it helps with her depression and anxiety symptoms."). At the hearing, the ALJ asked Byers why she had previously not taken her Zoloft and Byers answered, "I try to be pretty consistent with my medication."  Tr. 55.  *See* SSR 96–7p, 1996 WL 374186, at *7 (an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide.").  Thus, evidence does not support Byers' contention that it was financially impossible for her to comply with treatment or that she suffered from "psychological confusion." *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283-284 (6th Cir. 2009) (an ALJ should

consider whether a claimant's failure to seek treatment is another symptom of his impairment, but the record must contain evidence supporting such a finding).

Byers also cites to evidence in the record with respect to her prescription compliance for her physical ailments.  Doc. 16, p. 22.  An April 12, 2012, treatment note states, "[Byers] has not started Lyrica because she did not take it to Metro's pharmacy and the cost was prohibitive."  Tr. 787.  Even if Byers' took her Lyrica prescription to another pharmacy "mistakenly," as she alleges, this does not indicate that she was unable to afford the medication and could find no way to obtain it.  *See McKnight*, 927 F.2d at 242 (discussing a Fifth Circuit opinion involving a claimant who cannot afford prescribed medicine and can find "no way to obtain it."). Additionally, Byers' assertion that she did not take her Neurontin consistently because she did not realize how it worked, Tr. 946, is not alone indicative of "psychological confusion."

Because the record did not establish that Byers was unable to comply with regular treatment either because she was financially prohibited from doing so or because her mental limitations themselves interfered with her ability to do so, the ALJ did not err in considering Byers' noncompliance with treatment as part of her credibility assessment.

## VII. Conclusion

For the reasons set forth herein, the decision of the Commissioner is **AFFIRMED.**

Dated: January 8, 2015

_____
Kathleen B. Burke
United States Magistrate Judge